# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

LESLIE CUTRIGHT

               Plaintiff,                   Honorable Judge

v.                                     Case No.:

FCA US, LLC, a foreign limited
liability company, ANDREW CANTY
(individual and professional capacity),

And

INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE & AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA and UAW LOCAL 51
(jointly and severally); and
TONY WALKER (union capacity),

               Defendants.

_____/

Tracy G. Smith (P74572)
**SmithWebster Law Offices, PLLC**
*Attorney for Plaintiff*
29488 Woodward Ave. #427
Royal Oak, Michigan 48073
tsmith@smithwebster1.com

_____/

### PLAINTIFF'S COMPLAINT AND JURY DEMAND

There is no other pending or resolved civil action
arising out of the transaction or occurrence alleged
in the Complaint.

     NOW COMES Plaintiff LESLIE CUTRIGHT, by and through her attorneys,

SMITHWEBSTER LAW OFFICES, PLLC, and per her Complaint, states as follows:

1

## INTRODUCTION

***"Dyke", "You don't have balls for real", "I bench press 375, I can whoop your ass", I will "fuck you up."***

*These are a few of the harassing, threatening, intimidating slurs that Ms. Cutright endured as a male co-worker postured himself for attack. Mrs. Cutright was terminated.*

The termination of Leslie Cutright was blatant prejudice towards her sexual orientation. This country and the great state of Michigan no longer stand idle to this behavior in the workplace. Entities and organizations are obligated to act against discriminatory behavior. Surely, by no means may a company or its allies may retaliate against a victim of discrimination. In this matter, the written policies and procedures are not worth the paper written on when employers, its agents and unions refuse to operate in good faith.

## JURISDICTION

1. This action arises from Plaintiff's employment with FCA US, LLC (hereafter "FCA") and membership with the United Auto Workers.

2. This is an action to enforce civil rights arising out of Plaintiff's employment relationship with Defendant, FCA pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 USC 2000e et. seq., (hereafter "Title VII"), Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et. seq., (hereafter "ELCRA") and the common law of the State of Michigan Common Law, inter alia.

3. This court has subject matter jurisdiction pursuant to the §301of the Labor Management Relations Act (hereafter "LMRA"). (Exhibit A, Exerts from CBA)

4. This is an action to enforce civil rights under the Title VII and ELCRA, regarding Plaintiff Cutright, based on sexual orientation, hostile work environment and retaliation. After Plaintiff complained of harassment and sex orientation discrimination she was retaliated against in terms of conditions of her employment in violation of ELCRA, Title VII and LMRA.

5.      This court has subject matter jurisdiction pursuant to 42 USC 2000e-5 and 28 USC
1331, 1332, 1343(4) because the claim arise under the laws of the United States.

6.      To the extent the claims allege violations of state law, this Court has supplemental
jurisdiction over state law claims pursuant to 28 USC 1367, because those claims are so
related to the claims arising under federal law.

## VENUE

7.      Venue for this action is proper pursuant to 28 USC 1391, in that all defendant(s)
herein can be found, has agents present, and/or transacts affairs in this judicial district
Eastern District of Michigan and all events, occurrences or omissions giving rise to the
claims of this lawsuit occurred  in this district.

8.      Specifically, this cause of action arose in city of Detroit, Wayne County, Michigan
at Defendant Detroit Assembly Complex-Mack Facility.

9.      The amount in controversy exceeds $350,000.00 exclusive of interest, costs and
attorney fees.

## THE PARTIES

10.     Plaintiff, Leslie Cutright (hereafter "Plaintiff") is a 54 year old lesbian African-
American female and resident of Detroit in Wayne County, Michigan.

11.     Plaintiff, at all material times, was an employee of FCA and a dues paying member
of the UAW, Local 51.

12.     Defendant FCA US, LLC (hereafter "FCA") is a foreign limited liability company
organized under the laws of the State of Delaware, doing business in Wayne County,
Michigan.

13.     Defendant FCA, an auto manufacturer, is engaged in commerce or an industry or activity affecting commerce and employs more than 50 employees for each working day during each of 20 or more calendar workweeks in each calendar year relevant thereto; and is an employer within the meaning of Title VII and ELCRA.

14.     At all relevant times, Defendant FCA agents, including but not limited to Andrew Canty, were acting within the scope of their employment and under FCA's authority.

15.     Defendant FCA has, for all material times, a collective bargaining agreement with International Union United Automobile, Aerospace & Agricultural Implement Workers of America (hereafter "UAW International").

16.     Defendant UAW International is headquartered in Detroit, Michigan and represents thousands of non-managerial employees employed with automobile manufacturers in Michigan,).

17.     Defendant UAW Local 51 (hereinafter "Local 51") is a chapter of UAW International and represents FCA's employees in Detroit Assembly Complex – Mack (hereafter "DACM"). In good faith belief, membership agreement is in UAW's possession.

18.     Defendant the Local 51 & UAW International (hereafter "the Union" collectively) are labor organizations engaged in an industry affecting commerce, and represent the interests of the automobile manufacturing employees, protects the rights of its members in accordance with the *e FCA US LLC, FCA Fiat Chrysler Automobiles and the UAW* dated *December 16, 2019 for Production, Maintenance and Parts* (hereinafter "CBA") which was in effect at all material times.

19.     Defendant Andrew Canty a heterosexual male is FCA's employee managing Labor Relations at DACM.

4

20.      Defendant Casey Fiddler is the President of the Local 51, insured in his capacity as Union President.

21.      Defendant Tony Walker is the Union Representative at DACM for Local 51, insured in his capacity as representative.

22.      The amount in controversy exceeds $350,000, exclusive of interest, costs, and attorney fees.

## RELEVANT FACTS

### *The Papers*

23.      November 2, 1998 an UAW Administrative Letter was published the Policy on the Elimination of Workplace Sexual Harassment, where in pertinent part it states:

> Sexual Harassment is Grievable.
> ***
> Sexual harassment of a union member by another union member is a matter of grave concern.
> ***
> These kinds of grievances should be written against management, citing the employer's responsibility to maintain an environmental free of hostility.
> ***
> Because sexual harassment may cause a form of hostile work environment, the employer has a legal duty to maintain a work environment free of any form of sexual harassment. Likewise, the local union has an obligation, under law, to require management to promptly investigate such charges and to take immediate corrective action(s) where necessary when sexual harassment is reported.
> ***
> It is the position of the International Union that sexual harassment may be grieved as a form of sex discrimination under a no-discrimination clause and/or equal application clause where such language exists in the contract.
> ***
> The Union also has a duty to take prompt corrective action where the initial investigation indicates that sexual harassment has occurred. In this context, "prompt corrective action" means writing a grievance.

24.      December 16, 2019,  the *Agreements between the FCA US LLC, FCA Fiat Chrysler Automobiles and the UAW* dated *December 16, 2019 for Production, Maintenance and Parts,*(hereafter "CBA") in pertinent part stated:

**Section (39) Maintenance of Discipline:**

It is agreed that the maintenance of discipline is essential to the satisfactory operation of the plant.  During the course of negotiations, the Union raised the concern regarding discipline not being administered fairly and consistently for violations of the Company's Standards of Conduct.  The Company acknowledged that the issuance of discipline is intended to be corrective and not punitive in nature.

As a result of these discussions, the following guidelines have been established to ensure Standard of Conduct violations are dealt with collectively through the progressive disciplinary process:

- 1st Violation – Verbal Warning
- 2nd Violation – Written Warning
- 3rd Violation – Written Warning with Counseling
- 4th Violation – 3 Working Day Disciplinary Layoff
- 5th Violation – 30 Calendar Day Disciplinary Layoff
- 6th Violation -  Discharge

Circumstances will arise which necessitate corrective action that may not follow the standard progression guideline.  Disputes regarding disciplinary matters may be addressed through the grievance procedure.

**Section (42) Appeal of Discharge:**

Should a discharged employees or the Union representative and the Plant Shop Committee consider the discharge to be improper, a complaint shall be presented in writing through the Shop Committee to the Union Relations Supervisor within seventy-two (72) hours of the discharge.  The Management of the plant will review the discharge and give its answer within seventy-two (72) hours after receiving the complaint.  The management of each plant is authorized to settle such matters.  If the decision is not satisfactory to the Union, the matter shall be referred to Step 2 of the grievance procedure within five (5) working days after the management gives its answer to the Union.

*The Background Facts*

25.      On or about October 2020, Plaintiff was hired by Defendant FCA as a probationary employee at the Warren Truck and Assembly Plant (hereinafter "WTAP").

26.    On February 22, 2021, Plaintiff became a full-time, regular employee.

27.    In February 2021, Plaintiff was assigned to the Detroit Assembly Complex – Mack facility to the second shift, 2:30 p.m. to 10:30 p.m.  Plaintiff typically worked voluntarily 12 hours per day 6 days a week, reporting to work at 10:30 a.m. and ending her shift at 10:30 p.m.  Plaintiff worked on the B.S.R line where she drove cars, listening for any unusual rattles, knocks or sounds.

28.    On May 6, 2021 about 1:50 p.m., Plaintiff headed into work when she noticed co-worker Geneva Collie in her vehicle beckoning for assistance, she was suffering from a seizure.  Plaintiff stopped to help, ran to get security, and stayed with Collie on the passenger side of the vehicle. Plaintiff remained on the passenger side consoling Collie and speaking with her loved ones on the phone, while Collie remained in the driver's seat. Plaintiff was helping her fellow co-worker when Chelsea Milsap a heterosexual female from security came to the vehicle.  Milsap immediately yelled to passersby and onlookers to "get the fuck outta here."  Milsap attempted to unbuckle Collie's seatbelt, remove her mask and determine the whereabouts of medical personnel.  Then suddenly, Milsap was standing at the passenger side of Collie's vehicle screaming at Plaintiff, get the fuck outta here!"  Plaintiff responded, "now what you are not gonna do is talk to me like that" and Milsap screamed even louder, "GET THE FUCK OTTA HERE!"  Plaintiff said, "you can't talk to me like that."  Milsap made a call. Plaintiff decided to leave so Collie could receive the much needed attention.

29.    On May 6, 2021 about 4:45 p.m., Myron Weathers, Plaintiff's shift supervisor, escorted her to labor to meet with Defendant Andrew Canty (hereafter "Canty").  Canty told Plaintiff she was accused of a No. 37 violation involving security. Canty did not send

Plaintiff home, as he stated, she was not a threat to coworkers or herself. Plaintiff worked with strict instructions not to discuss the incident involving Collie and or to have any contact with security. Plaintiff asked Canty to review the video footage to prove her innocence as to *any* violation.

30.     On May 7, 2021, Kendra Foster (hereafter "Foster"), Rosalyn Grant (hereafter "Grant") both Union Reps and Canty reviewed video footage of the Collie incident.  They saw and it was confirmed Collie flagged for help, Plaintiff responded to Collie, Plaintiff contacted security, Plaintiff was on the passenger side and Milsap came around to the passenger side aggressively.  In addition to the video, two witnesses gave statements contradicting the notion of any FCA violation on behalf of Plaintiff.

31.     On May 7, 2021 at 3:13 p.m., Plaintiff was given a Notice of Suspension, Disciplinary Layoff or Discharge dated May 7, 2021 for pending investigation of SOC No. 14; Plaintiff was sent home for three days without pay. In good faith belief, this sudden change in discipline, from a verbal discussion to a suspension without pay, is due to the romantic relationship between Milsap and Canty, believed to be supported by an unmerited promotion of Milsap, the security guard, to Labor HR department to work alongside Canty.

> Standard of Conduct No. 14 reads as follows:
>
> Threatening, intimidating, coercing, harassing, retaliating, or abusive words and/ or actions, conveyed physically, orally, in writing or otherwise, that would cause reasonable people to take actions against their will, feel unsafe, uncomfortable, or in fear of danger or violence, including directing aggressive use of obscene or profane language or gestures toward or in the presence of another.

32.     On May 10, 2021, Plaintiff returned to work and asked the Local 51 Union Rep to file a grievance to recoup her lost wages. That request was made repeatedly over the next few weeks.

33.     On May 11, 2021, Plaintiff was given a copy of FCA DACM Supervisor's Report alleging violations of threatening, intimidating, coercing or harassing; leaving the workstation without permission; and failure to display identification.     Management and Local 51 refused to signed this document which alleged:

> On 05/06/021 Leslie Cutright was observed using profane language and making verbal threats towards a member of the security team as well as refused to identify herself when directly asked to do so by security.

34.     On June 1, 2021, Union Rep Foster completed a Grievance Form which stated Canty gave a 3-day suspension to conduct an investigation which resulted in a verbal warning.  It also pointed out that Management was in violation of the National Contract in that it gave a suspension [without pay] for a written warning. The Union requested Plaintiff be fully compensated for lost wages.  Notably, this grievance form is void of a grievance number usually supplied by Labor Relations. Plaintiff was never compensated for her lost wages.

### *The Harassment and Retaliation*

35.     Kali Gaiter (hereinafter "Gaiter"), a heterosexual male co-worker, continuously referred to Plaintiff as "gay bitches" and stated that she thought she was a man.  Plaintiff repeatedly asked Gaiter not to talk to her.

36.     In or about May 2021, Gaiter stood extremely close to Plaintiff (in her face) to intimidate her as he acted out how he was planning to hit her, physically. He hurled slurs at Plaintiff, calling her "gay", "gay bitch", "broad" and more of the like.

37.      Plaintiff was intimidated and afraid for her life.  Larry Jones, Team Leader and Michael Gilliam, Junior Team Leader ran over to pull Gaiter back and away from harming Plaintiff.

38.        In or about August 2021, Gaiter had an altercation with Larry Jones ("Jones"), heterosexual male, in which security was called to diffuse the situation. In fact, Gaiter was escorted out by security.  Both Gaiter and Jones were suspended for 30 days by Canty, in agreement with Local 51 Union Rep.  Tony Walker ("Walker").  In accordance with the suspension, both Gaiter and Jones returned to work.

39.        On September 20, 2021, about 9:20 p.m., Plaintiff was sitting in her assigned seat, when Gaiter passed Plaintiff and said, "excuse me." Gaiter then stood over Plaintiff and proceeded to convey his intent to run over Plaintiff physically if she "hadn't moved her big ass man feet."   Plaintiff remarked that he wasn't going to do anything to her.

40.        Gaiter then began to brag that he can bench press 375 lbs. and could easily "whoop her ass". Plaintiff responded that "you're not going to put your hands on me."

41.        Gaiter began verbally assaulting and insulting Plaintiff.  He said that she "was not a real man" she "just thinks" she is [a real man].  Plaintiff still sitting, explained her sexuality had nothing to do with her defending herself.  Kali Gaiter continued to verbally attack Plaintiff calling her names like snitch and gay bitch.  Plaintiff finally was able to remove herself from the situation.

42.        Plaintiff was in the BSR area and was approached by Larry Jones regarding signing up for additional training, when Gaiter unexpectedly walked up and without reason began to tell Plaintiff that he could whoop her "easily", called Plaintiff a "bum", said "even though you think you are a man you ain't got no balls for real", and threatened to "fuck" her up. Plaintiff in the middle of the rant called Gaiter a FCA gangster who was bullying.

43.        Disturbed by the stalking and verbal attack, Plaintiff returned to her work station. Kali Gaiter went to the middle of the floor as if to retrieve a car to test drive but

unexpectedly, he ran to where Plaintiff was seated and stood over her threatening her, yet again, with a barrage of verbal assaults and insults included calling Plaintiff a "dyke" "gay bitch", "snitch", a "weak bitch", "old", "fat" and "slow" and other slurs.  He repeatedly, threatened to physically assault her by promising to "fuck" her up. Plaintiff overwhelmed went for help.

44.      Immediately, Plaintiff sought the help of Mike Gilliam. He instructed her to contact the Local 51 union steward and make a report because the Union should be aware of what was happening on the plant floor.

45.      Plaintiff called Defendant Tony Walker the Local 51 Union Rep. (hereafter "Walker") upset, afraid and concerned for her safety.  Plaintiff told Walker of the threats, assaults and insults that she endured over the last 30 minutes. Walker instructed Plaintiff to leave B. S. R. and meet him at the paint shop. Plaintiff met Walker at the paint shop and gave a very detailed account of what had occurred and then asked to file a formal complaint.

46.      Walker clarified whether or not Plaintiff was threatened by Kali Gaiter and divulged that he worked out (to mean lift weights or exercise) daily with Gaiter at Powerhouse Gym on Grand River.  Instead of immediately filing the complaint, Walker recommended that this matter "stay between the union brothers and sisters" and offered to talk to Gaiter, a non-union employee, along with the committee woman Rosalyn Grant (hereafter "Grant").  Plaintiff refused the offer and re-emphasized the seriousness of the incident and again requested a formal complaint to be filed with FCA's Labor 1) Gaiter's harassing threats and insults were recurring and 2) she was afraid of him.

47.     Plaintiff repeatedly requested Walker and Local 51 to file a complaint and to look at video footage to confirm that Gaiter approached her at least four (4) different times cursing, blurting obscenities, standing over her hurling threats and making intimidating gestures at Plaintiff from about 9:10 to 9:50.

48.     Eventually on September 20, 2021, Plaintiff was given and completed the Statement of Fact form from Walker.

49.     On September 21, 2021 at about 2 p.m., Plaintiff and Walker meet with Labor relations, specifically Andrew Canty.

50.     Plaintiff handed the Statement of Facts to Canty, he did not review it in Plaintiff's presence, and told Canty of the repeated physical threatens and harassment she endured because of her sexual orientation. Canty's only question, in a sarcastic tone, "so you are being harassed, huh?" After which, Walker gestured for Plaintiff to leave the office.

51.     Upon leaving the office, Plaintiff, alone, passed Gaiter in the waiting area, where they both remained until Gaiter was called. Canty did not have any documents with him. Gaiter was called into the office and met with Walker and Canty. Plaintiff waited a very long time until Walker appeared to walk Plaintiff back to B.S.R. to retrieve her personal belongings. Gaiter remained in the office.

52.     Plaintiff and Walker returned to Canty's office. He informed Plaintiff she was being sent home pending an investigation because she was a security risk; gave her a Notice of Suspension, Disciplinary Layoff or Discharge; informed her the investigation can take 3 to 30 days but it will not take that long; and advised her to walk away and leave the area in the event that she is confronted again.

53.     On September 22, 2021 about 12:30 p.m., Plaintiff called and asked Walker if he had an opportunity to review the video footage.  Walker indicated he and Canty scheduled to review the video footage at 2:00 p.m.

54.     About 5:20 p.m., Plaintiff received a call from Walker who said Canty reviewed the footage; Canty thought the angle was bad; and that Rosalyn Grant (hereafter "Grant"), the committee person, will look at the video footage from the cameras.

55.     Later that evening, Plaintiff spoke with Grant regarding the events that occurred with Gaiter and the value of watching the video footage from 9:10 p.m. to 9:50 p.m., to prove Plaintiff was the one being threatened, assaulted and verbally abused.

56.     In that same conversation with Grant, Plaintiff asked for a different union representative other than Walker who admitted he and Gaiter were fitness partners and showed bias in attempts to discourage Plaintiff from filing a complaint. Rosalyn refused to assign another union representative.

57.     On September 28, 2021, Plaintiff obtained a statement from Larry Jones, team leader, who gave his account of Gaiter's harassing behavior towards Plaintiff and stated he contacted Myron Weathers the Supervisor for Cert Line.   Jones pointed out in his statement that Gaiter has a history of workplace violence despite Defendant FCA's zero tolerance policy.

58.     On October 2, 2021 about 1:30 p.m., Plaintiff received a call from Walker. He informed Plaintiff that she and Gaiter should return to work October 25, 2021.  Plaintiff asked for the reason for her 30-day suspension when she was the one assaulted, threatened, harassed and abused. Walker said, Gaiter's statement stated Plaintiff threatened him.

Plaintiff discussed concerns of her safety and working in the same area as Gaiter. Walker promised Gaiter would be moved out of the department.

59.     On October 10, 2021, Plaintiff attended the Local 51 union meeting where she spoke in the mic, to Local 51's President, Casey Fiddler and Vice President, Timothy Harper (hereafter Mr. Harper) about the verbal abuse, harassment and threats; unsafe working environment, being called "dike" and "gay bitches" on the floor.  She complained about her unjust suspension by FCA.    Also, Plaintiff complained about Walker's dismissive attitude and unprofessional suggestion they [Union and HR] should allow Plaintiff and Gaiter to fight in the shaker room; the union representative's bias (referring to Walker); failure to operate on her best interest, and the need for a new union rep. After the meeting, VP Harper instructed Plaintiff to email copies of her statement directly to his attention and to call Defendant FCA's Diversity Department (hereafter "Diversity").

60.     As advised, Plaintiff submitted a report to Diversity through EthicsPoint claiming discrimination and harassment because of sexual orientation.

61.     On October 11, 2021, Defendants FCA, through its agents and employees and Canty prepared and certified mailed a Notice of Suspension, Disciplinary Layoff or Discharge dated September 21, 2021 signed by all Defendants terminating Plaintiff; and a Stellantis DACM Supervisor's Report dated 09/20/21, signed by Canty and Walker.   The alleged discharge reason was "violation of SOC 14 & 15" and "workplace violence policy and 3-6"and the Supervisor's fabricated report read:

> On 09/20/2021 Leslie Cutright engaged in a verbal altercation with Kali Gaiter. During the altercation Leslie aggressively approached Kali and made several physical threats.  During the interview in reference to the incident Leslie state she had in fact used threatening language and profane language.

14

62.     On October 12, 2021 about 9:30 a.m., Plaintiff received a call from Vice President Harper confirming he received her emails. He reiterated the importance of calling diversity and Plaintiff informed Mr. Harper that she had. Mr. Harper requested that the Union be given an opportunity to properly handle her case. Plaintiff asked yet again, that Walker be removed as union rep. Mr. Harper indicated that he and Grant would take care of the grievance.

63.     On October 13, 2021, Plaintiff emailed Mr. Harper for an explanation for her account's deactivation. She specifically pointed out that the deactivation took place after the union meeting because she logged in to her account after the meeting to verify the $18.54 progression pay. Mr. Harper never responded.

64.     On October 14, 2021 about 11:00 a.m., Plaintiff missed a call from President Casey Fiddler (hereafter "Mr. Fiddler") Plaintiff returned Mr. Fiddler's call about 11:30 a.m. and left a message.

65.     On October 16, 2021, Plaintiff received, in the mail, Defendant FCA's certified letter from Stellantis Detroit Assembly Complex Mack with the Notice of Suspension, Disciplinary Layoff or Discharge dated 09/21/21 indicating discharge and the Stellantis DACM Supervisor's Report dated 09/20/21, signed by Tony Walker and Andrew Canty. Plaintiff age 54, planned and expected to work for Defendant FCA until her retirement age or beyond.

### *Failed Union Representation*

66.     On October 18, 2021 about 3:00 p.m., Plaintiff went to the Region 1 Building to speak with Rashawn Byrd, UAW Regional Director ("Byrd"), who was not at the building at that time.

67.     On October 18, 2021, Plaintiff received a call from Walker informing Plaintiff that her return date was moved back pending further investigation resulting from a complaint filed at Diversity regarding Gaiter.  Plaintiff inquired about her termination and Walker instructed Plaintiff to disregard the discharge letter because Plaintiff would be returning to work.  Walker stated he had a meeting with Canty scheduled for Friday (presumably October 22, 2021) to obtain Plaintiff's return date.

68.     On October 18, 2021 about 9:45 p.m., Plaintiff received a second call from Walker, he informed Plaintiff that November 1, 2021 was her new return date and mentioned he needed to speak to Canty.

69.     On October 19, 2021 about 1:50 p.m. Plaintiff received a call from Byrd the UAW Regional Director.  Byrd explained the grievance process and stated the discharge and grievance would be handled by Rosalyn Grant, due to the discharge.  Plaintiff mentioned that Mr. Fiddler and Mr. Harper were not returning her calls. Byrd called Mr. Fiddler and relayed a message to her that he would contact Plaintiff.

70.     On October 21, 2021 about 2:00 p.m., Mr. Fiddler called. Plaintiff expressed her fear of Gaiter, restate the events, explained why she went to Labor and how the Union has failed her.  Fiddler admitted Gaiter had a history of work related problems and that his name came across Fiddler's desk often.  Mr. Fiddler also alleged that Labor suspended both Plaintiff and Gaiter because it is a policy violation to talk back to each other. Plaintiff asked for the reason for being fired, Fiddler said she was suspended pending investigation per a conversation with Canty earlier that day.  Plaintiff next inquired about the discharge notice and offered to email him a copy.   Fiddler assured Plaintiff that he and Grant would

work to return Plaintiff to work but the Union would have to wait until Diversity's investigation concluded.

71.      On November 22, 2021 about 3:50 p.m., Plaintiff called Grant for an update.  Grant stated Plaintiff was coded "suspended" in the system and the grievance regarding the September 20, 2021 incident had not been drafted; that after two months of Plaintiff being unemployed the Union would need another copy of her statement and the discharge papers; that Canty was taking the May 6th Milsap incident personally and would not let it go; that Canty was being biased towards Plaintiff; and that Walker and Gaiter's relationship would not impact the grievance process.

72.      Soon after, Plaintiff received from Grant a copy of FCA Code of Conduct, page 179, *Special Protection Against Sexual Harassment* which confirmed collective bargaining sought to eradicate sexual harassment  and sexual orientation could be grieved the same as any other type of improper discrimination.

73.      On November 23, 2021 at 9:17 a.m., Plaintiff emailed Grant for an update on her employment.  Plaintiff, yet again, voiced her outrage to the sexual orientation harassment that she was subjected to by Gaiter and the hostile working conditions; the biased personal attack by Canty; the blatant failure of the Local 51 and the International Union as a whole; FCA's unjust termination and retaliation which included the union's participation.

74.      On November 30, 2021 at 11:00 a.m., Plaintiff met with Reggie Griffith and the Assistant Director of Regional, UAW regarding the state of both the May and September incidences.   The Assistant Director and Griffin after reviewing Plaintiff's documents agreed the grievance from the May 6th incident was unfiled and incomplete and that the

September 20th discharge papers were questionable, suspect and improper. The Assistant Director assured Plaintiff that he would meet with Director Byrd.

75.     On December 1, 2021 about 11:00 a.m., Plaintiff met with Byrd to discuss the grievance process. Byrd took copies of documents but could not promise Local 51 would file a grievance.

76.     On December 9, 2021 about 9:00 a.m., union representative Walker, called Plaintiff inquiring about the status of the discharge. Walker claimed he had a return date and planned to remove Gaiter from the work area but could not determine where it went wrong. Plaintiff reminded Walker that he in fact signed the discharge papers.

77.     On December 12, 2021 about 1:15 p.m., Plaintiff received a call from Frank Grace of the International U.A.W. asking for her account of events to which he responded, "no dues paying member should be without a grievance after a discharge" and one should have been written by now. Grace remarked that he would contact Mr. Fiddler.

78.     On December 13, 2021 about 3:45 p.m., Plaintiff received a call from Mr. Fiddler updating Plaintiff, that he is personally in talks with the company and the company wanted Plaintiff to return to work but the Union and FCA were negotiating compensation for lost wages. Mr. Fiddler expected an answer from Canty regarding the investigation and promised Plaintiff a return date no later than the next day.

79.     On December 17, 2021 about 10:15 a.m. Plaintiff received a call from Grant with an update on the suspension/discharge, the company wants Plaintiff back; and Local 51 is waiting on the Diversity to interview 2 more employees and close the case.

80.     The same day, Plaintiff received a copy of the Grievance Form no. 2124700528 dated December 7, 2021 and signed by Grant, Walker and Canty on December 13, 2021.

Local 51 acknowledged Plaintiff's good work performance; that Plaintiff was in fact harassed, threatened and intimidated; that Plaintiff acted reasonable in consideration of the circumstances; "nothing in Ms. Cutright's (sic) statement says that she violated S.O.C. 14 or 15" and that Plaintiff "did the right thing."

81.     Finally, after the Defendants false return to work dates and promises of a return to work date Plaintiff did not immediately file a claim with the EEOC.  However, after numerous attempts to file a charge with the EEOC however, the EEOC electronic filing system is not functional Plaintiff was given a May date to meet outside of the statute of limitations period.

## COUNT I
## WRONGFUL TERMINATION
## AS TO DEFENDANTS FCA US, LLC.

82.     Plaintiff hereby repeats and incorporates paragraphs 1 through 81, as set forth herein and above by reference.

83.     Defendant FCA acted through its agents, representations and employees.

84.     While Plaintiff was employed by Defendant, Defendant's policies and procedures, which were reasonably related to employee discharge, instilled legitimate expectations of just-cause employment in Defendant's employees, including Plaintiff.

85.      Plaintiff reasonably relied on these policies and procedures and, as a result, legitimately expected that she would not be terminated except for just cause.

86.     Plaintiff relied on Defendant's policies, statements and representations Defendant made through its agents, employees and representatives.  As a result, there was, by express words, implications, or operation of law, a contractual agreement between Plaintiff and

Defendant by which Defendant was obligated to terminate Plaintiff's employment only for good cause.

87.     As a result of Defendant's termination of Plaintiff's employment, Defendant has breached the contract described herein.

88.     Defendant, by and through its agents, representatives and employees wrongfully terminated Plaintiff.

89.     Defendant, by and through its agents and employees, was intentional in its actions and omissions in its decision to terminate Plaintiff.

90.     Defendant's agent, Canty, assisted the harasser Gaiter in drafting the  Statement of Facts including any fabrication that Plaintiff threatened, verbally abused or in any way violated the code of conduct; and without an investigation used the unsupported untruthful as grounds for suspension and ultimately termination.

91.     Defendant FCA's agents, representative and employees, specifically Canty acted in retaliation of Plaintiff's complaint of discrimination at the Union meeting and to Diversity.

92.     Defendant FCA's agent, Canty, intentionally disregarded the validity and truthfulness of the video footage regarding of the events with Gaiter on September 20, 2021.

93.     Plaintiff relied on Defendant's representation of its policies and procedures to her detriment.  Plaintiff would not have been suspended or terminated if not for FCA's malice or blatant disregard of its policies.

94.     As a direct and proximate result of Defendant's wrongful acts and omissions, Plaintiff has sustained loss of earnings, earning capacity, and fringe benefits and has

suffered mental anguish, emotional distress, humiliation and embarrassment, and loss of reputation.

## <u>COUNT II</u>
## SEXUAL ORIENTATION DISCRIMINATION
## IN VIOLATION OF ELLIOT-LARSEN CIVIL RIGHTS ACT
## AS TO DEFENDANT FCA US, LLC.

95.     Plaintiff hereby repeats and incorporates paragraphs 1 through 94, as set forth herein and above by reference.

96.     At all material times, Plaintiff was an employee, and Defendant was her employer as defined in Elliott-Larsen Civil Rights Act, MCL 37.2101 et. seq.

97.     The actions and omissions of Defendant FCA and its agents, representatives, and employees, acts and omissions were intentional.

98.     Plaintiff's sexual orientation was at least one factor that made a difference in Defendant's decision to subject her to discriminatory and disparate treatment described above.

99.     Plaintiff's sexual orientation was at least one factor that made a difference in Defendant's decision to terminate Plaintiff.

100.     Defendant, by its agents, representatives, and employees, was predisposed to discriminate on the bases of gender and sexual orientation and acted in accordance with that predisposition.

101.     Defendant, through its agents, representatives, and employees, treated Plaintiff differently from similarly situated heterosexual employees in the terms and conditions of employment, based on unlawful consideration of sexual orientation.

102.     If Plaintiff had been a heterosexual male, Plaintiff would not have been terminated.

21

103.     Plaintiff did not have a history of harassment or legitimate violation of FCA's standard code of conduct.

104.     Defendant repeatedly suspended Gaiter for harassing, violence and creating a hostile work environment and allowed to return to work, prior to the incident with Plaintiff.

105.     Gaiter, heterosexual, harassed Plaintiff on multiple occasions.  The initial incident in May occurred in the presence of a supervisors.  Defendants did not act to cure the harassment or provide a safe environment.  Thus, Gaiter was not terminated and his harassment continued.

106.     Defendant refused to follow its policy and procedures regarding harassment and sexual harassment because of Plaintiff's sexual orientation.

107.     Defendant neglected to provide a safe environment.

108.     If Plaintiff had been heterosexual and/or demonstrated more femininity, Defendant would have protected Plaintiff from the threats and acts of violence that Gaiter unleashed. When Gaiter accosted Jones, two heterosexual men, security immediately disrupted that argument.

109.     If Plaintiff had been heterosexual or demonstrated more femininity, Defendants would have removed Gaiter from the facility and disciplined Gaiter, only.

110.     If Plaintiff had been heterosexual or held traditional female mannerism, Defendants would not have suspended or terminated Plaintiff.

111.     If Plaintiff had been a heterosexual male, Defendant would have returned Plaintiff to work after a fair and impartial investigation.

112.     Defendant's actions were intentional disregard for Plaintiff's rights and sensibilities.

113.     As a direct and proximate result of said acts and omissions under ELRA of Defendant's agents and employees, Plaintiff has suffered and will continue to suffer loss of earning capacity, loss of dignity and enjoyment of life, mental and emotional distress, pain and suffering, embarrassment and humiliation.

**COUNT III**
**SEXUAL ORIENTATION DISCRIMINATION**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**
**AS TO DEFENDANTS FCA US, LLC.**

114.     Plaintiff hereby repeats and incorporates Paragraphs 1-112 by reference as if fully restated herein.

115.     At all material times, Plaintiff was an employee, and Defendant was her employer covered by and within the meaning of Title VII of the Civil Rights Act of 1964 (Title VII), as amended.

116.     Plaintiff's gender and/or sexual orientation was a factor that made a difference in Defendant's decision to subject her to wrongful and discriminatory treatment described above.

117.     Defendant, by its agents, representatives and employees, was predisposed to discriminate on the basis of sex or sexual orientation and acted in accordance with that predisposition.

118.     Defendant's actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities.

119.     If Plaintiff had been a heterosexual male, she would not have been treated in the manner described.

120.     As a direct and proximate result of said acts and omissions under Title VII  of Defendant's agents and employees, Plaintiff has suffered and will continue to suffer loss

of earning capacity, loss of dignity and enjoyment of life, mental and emotional distress, pain and suffering, embarrassment and humiliation, requiring professional medical treatment.

**COUNT IV**
**RETALIATION IN VIOLATION UNDER MICHIGAN'S**
**ELLIOT-LARSEN CIVIL RIGHTS ACT AS TO**
**DEFENDANTS FCA US, LLC. AND ANDREW CANTY**

121.    Plaintiff hereby repeats and incorporates paragraphs 1 through 119, as set forth herein and above by reference.

122.    Defendants intentional retaliated against Plaintiff by taking adverse employment actions in terminating Plaintiff.

123.    Defendants FCA, through its agents and representatives and Canty, retaliated in violation of ELCRA because Plaintiff filed formal claims with the Union and Diversity regarding FCA's adverse discriminating employment actions.

124.    The Defendants FCA, through its agents and representatives and Canty, were malicious and egregious in their response to Plaintiff's complaint of violations against her civil liberties.

125.    The Defendants FCA, through its agents and representatives and Canty, intentionally retaliated against Plaintiff by taking adverse employment actions in terminating Plaintiff; and refusing to follow its investigation procedures.

126.    The Defendants FCA, through its agents and representatives and Canty, initially intending to return Plaintiff to work on October 25th retaliated by terminating Plaintiff within hours of her openly speaking at Local 51's union meeting.

127.     The Defendants FCA through its agents and representatives and Canty, initially intending to return Plaintiff to work on October 25th retaliated by terminating Plaintiff within hours of her informing Diversity of the harassment and discrimination that she suffered at FCA.

128.     The Defendants FCA through its agents and representatives and Canty, terminated Plaintiff in retaliation of her informing Diversity and the Union about the harassment, threats, the hostile work environment and abuses she suffered specifically because she identifies as lesbian.

129.     Defendants were in recklessly disregard in its decision to discharge Plaintiff. Defendant should have known that it was retaliatory, discriminatory or wrong.

130.     As a direct and proximate result of said acts and omissions under ELRCA of Defendant's agents and employees, Plaintiff has suffered and will continue to suffer loss of earning capacity, loss of dignity and enjoyment of life, mental and emotional distress, pain and suffering, embarrassment and humiliation.

**COUNT V**
**RETALIATION IN VIOLATION UNDER MICHIGAN'S**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**
**DEFENDANTS FCA US, LLC. AND ANDREW CANTY**

131.     Plaintiff hereby repeats and incorporates paragraphs 1 through 129, as set forth herein and above by reference.

132.     Defendants FCA through its agents and representatives and Canty retaliated against Plaintiff for having complained about Defendant's discriminatory employment practices described above, in violation of Title VII.

133.     Defendant's actions were intentional, with reckless indifference to Plaintiff's rights and sensibilities.

134.     Defendants FCA through its agents and representatives and Canty, retaliated in violation of Title VII because Plaintiff filed formal claims with the Union and Diversity regarding sexual orientation discrimination.

135.     Defendants were in recklessly disregard in its decision to discharge Plaintiff. Defendant should have known that it was retaliatory, discriminatory or wrong.

136.     As a direct and proximate result of said acts and omissions under ELRCA of Defendant's agents and employees, Plaintiff has suffered and will continue to suffer loss of earning capacity, loss of dignity and enjoyment of life, mental and emotional distress, pain and suffering, embarrassment and humiliation.

**COUNT VI**
**HOSTILE WORK ENVIRONMENT**
**IN VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT**
**AS TO DEFENDANT FCA US, LLC**

137.     Plaintiff hereby repeats and incorporates paragraphs 1 through 135, as set forth herein and above by reference.

138.     At all material times, Plaintiff was an employee, and Defendant FCA was her employer as defined in Elliott-Larsen Civil Rights Act, MCL 37.2101 et. seq.

139.     Plaintiff was sexually harassed by Defendant's agents and employees throughout the course of her employment.

140.     The harassment Plaintiff suffered altered her conditions and unreasonably interfered with her work performance.

141.     The harassment included, but is not limited to, threatening, intimidating, abusive and offensive slurs; stalking Plaintiff around the facility with continued threats; and acts of intimidation and threats of violence directed at Plaintiff regarding her sexual orientation.

142.     Defendant FCA, well aware of the Gaiter's violent behavior, allowed him to harass Plaintiff in May 2021, neglected to correct his verbal attacks, or to stop Gaiter in September 2021 from the verbal assault and the physical threats and acts of intimidation.

143.     The actions of Defendant FCA and its agents, representatives and employees were intentional.

144.     The conduct of Defendant's employees in harassing Plaintiff because of her sexual orientation or because of her gender constitutes sexual discrimination in violation of ELCRA.

145.      As a direct and proximate result of Defendant employee's unlawful actions against Plaintiff as described, Plaintiff has suffered injuries and damages, including, but not limited to, potential loss of earnings and earning capacity; loss of career opportunities; mental and emotional distress and humiliation.

**COUNT VII**
**HOSTILE WORK ENVIRONMENT**
**IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**
**AS TO DEFENDANT FCA US, LLC**

146.     Plaintiff hereby repeats and incorporates paragraphs 1 through 144, as set forth herein and above by reference.

147.     At all material times, Plaintiff was an employee, and Defendant FCA was her employer as defined in meaning of Title VII of the Civil Rights Act of 1964, as amended.

148.     Defendant FCA had a responsibility to maintain a safe environment free of hostility and harassment.

149.     Plaintiff was sexually harassed by Defendant's agents and employees throughout the course of her employment.

150.     The harassment has included, but is not limited to, threatening, intimidating, abusive and offensive slurs; and threatening, intimidating and offensive conduct directed at Plaintiff regarding her sexual orientation.

151.     Defendant FCA, was aware of the Gaiter's hostile behavior, permitted such behavior to continue after the May attack, neglected to correct his egregious behavior, and failed to stop Gaiter in September 2021 from the verbal assault, the physical threats and acts of intimidation.

152.     The acts or omissions of Defendant FCA and its agents, representatives and employees were intentional.

153.     The conduct of Defendant's agents and employees in harassing Plaintiff because of her sexual orientation constitutes sexual harassment in violation Title VII.

154.      As a direct and proximate result of Defendant employee's unlawful actions against Plaintiff as described, Plaintiff has suffered injuries and damages, including, but not limited to, potential loss of earnings and earning capacity; loss of career opportunities; mental and emotional distress and humiliation.

**COUNT VIII**
**BREACH OF CONTRACT**
**AS TO DEFENDANT FCA**

155.     Plaintiff hereby repeats and incorporates Paragraphs 1-153 by reference as if fully restated herein.

156.     Defendant recognizes the Defendant the Union (International Union and UAW Local 5) as the exclusive representative for purposes of conditions of employment in accordance with National Labor Relations Act.

157.     Defendant entered into the CBA with Defendant International Union and UAW Local 51 to set forth terms and conditions of employment, and to promote orderly and peaceful labor relations for the mutual interest of the Company, the employees and the Union.

158.     Defendant agreed that the issuance of discipline is intended to be corrective and not punitive in nature.

159.     Defendant breached the agreement upon Plaintiff's termination which was not corrective but punishment for reporting disparate treatment to the Union and Diversity.

160.     Defendant agreed to progressive disciplinary process for dealing with violations of its Standard of Conduct.

161.     Defendant breached the agreement upon Plaintiff's termination when it failed to follow the progressive disciplinary process.

162.     Defendant acknowledges circumstances may arise which may necessitate corrective action that may not follow the standard progression guideline.

163.     Defendant breached the agreement upon Plaintiff's termination when Defendant FCA by and through its agents and representatives, in bad faith,  without any circumstance or reason, except to discriminate, disparate treatment  and in retaliation in violation of Title VII, ELCRA, inter alia refused to follow the disciplinary progress guideline.

164.     Defendant's conduct as described in this complaint constituted a breach of the contract with the Union.

165.     Plaintiff has been damaged by Defendant FCA's breach with loss of income, loss of potential earnings including bonuses, loss of FCA matching contributions to retirement funds, loss of interest on retirement and attorney fees.

<u>COUNT IX</u>
**BREACH OF DUTY OF FAIR REPRESENTATION
AS TO DEFENDANTS INTERNATIONAL UNION, UAW LOCAL 51,
CASEY FIDDLER AND TONY WALKER**

166.     Plaintiff hereby repeats and incorporates Paragraphs 1-164 by reference as if fully restated herein.

167.     At all material times, Plaintiff was a dues paying member of the UAW Local 51 and Defendants held a duty to provide fair representation.

168.     Defendants had a duty under the LMRA and CBA to fairly represent Plaintiff's interests and protect her rights.

169.     Plaintiff's termination was without just cause and grounds for Defendants immediate representation to demand FCA provide proper corrective action.

170.     Defendant had an absolute duty to enforce substantive rights set forth in the CBA, regarding sexual orientation discrimination, hostile working environment and retaliation.

171.     Defendants were negligent, dishonest or perfunctory in the representation of Plaintiff giving rise to unfair representation liability.

172.     Defendants breached their statutory duty to fairly represent Plaintiff's interest under the CBA as the Defendants acted in bad faith, in an arbitrary manner and discriminatorily.

173.     Defendants breached their duty by failing to file the grievance, failed to investigate the assault and hostile working conditions, terminating Plaintiff and not returning Plaintiff to work.

174.     Defendants' intentional refusal to pursue Plaintiff's grievance without reason; responding to her requests for a grievance in jest; failure to actively investigate the 30-day suspension and ultimate termination were not in Plaintiff's best interest.

175.     Defendants' most heinous offense was signing-off agreement Plaintiff's unjust termination by FCA in retaliation, and amid her claims of unsafe work environment and discrimination.

176.     Defendants breached its duty of fair representation when they repeatedly disbursed false information, fabricated return dates delaying potential EEOC help and assistance, and failed to return Plaintiff to work.

177.     Defendants' intentional acts and omissions deprived Plaintiff of her right to union assistance.

178.     Defendants are without a meritorious defense for its poor action or inaction.

179.     Plaintiff has been damaged by Defendants breach with loss of income, loss of potential earnings including bonuses, loss of FCA matching contributions to retirement funds, loss of interest on retirement, loss of career opportunities; mental and emotional distress, humiliation and attorney fees.

## COUNT X
## BREACH OF CONTRACT
## AS TO DEFENDANT INTERNATIONAL UNION AND UAW LOCAL 51

180.     Plaintiff hereby incorporates Paragraphs 1-178 by reference as if fully restated herein.

181.     Plaintiff is a dues paying member to UAW Local 51 and International Union.

182.     Plaintiff entered into an agreement with Defendants for fair representation with her employer Defendant FCA.

183.     Defendants held themselves to be and FCA acknowledged Defendants are the exclusive representative on Plaintiff's behalf.

184.     Defendants had a duty to represent Plaintiff in employment disputes or grievances with her employer Defendant FCA.

185.     Defendants breached its agreement when by and through its agents, it refused to file a grievance in regard to the May 6th and September 20th incidents.

186.     Defendants breached its agreement when by and through its agents, it failed to review video in regards the May 6th and September 20th incidents.

187.     Defendants breached its agreement, by and through its agents, it failed to represent and complete a grievance process to recoup unpaid wages in regards to the May 6th incident.

188.     Defendant breached its agreement, by and through its agents, when it failed to require management to promptly investigate charges of harassment and to take immediate corrective action.

189.     Defendant breached its agreement when by and through its agents, regarding the September 20th incident, failed to promptly write a grievance; it failed to defend Plaintiff in the unwarranted 30 day suspension; failed to provide Plaintiff accurate information; worked in tandem with Defendant FCA to discriminate and to retaliate against Plaintiff; and  failed to file a grievance on Plaintiff's behalf.

190.     Defendants were aware of the discrimination as it had been reported.

191.     Defendants conduct as described in this complaint constituted a breach of the contract.

192.     Plaintiff has been damaged by Defendants breach with loss of income, loss of potential earnings including bonuses, loss of interest on retirement, loss of career opportunities; mental and emotional distress, humiliation and attorney fees.

WHEREFORE, Plaintiff requests that his Court enter judgment in his favor and against Defendants

for the following relief:

1.  Legal Relief

    a.  a judgment for  $350,000.00 and/or lost wages, in whatever amount she is found to be entitled;

    b.  compensatory damages in whatever amount she is found to be entitled;

    c.  punitive and exemplary damages commensurate with the wrong and Defendants' ability to pay;

    d.  an award of interest, costs, and reasonable attorney fees;

2.  Equitable relief

    a.  an injunction prohibiting Defendants from exercising its policy and custom of discriminating as described herein;

    b.  an award or interest, costs, and reasonable attorney fees,

    c.  whatever other equitable relief appears appropriate at the time of trial.

                    Respectfully submitted,

                    SMITHWEBSTER LAW OFFICES, PLLC.

                    By: /s/ Tracy G. Smith
                        Tracy G. Smith
                        *Attorney for Plaintiff*
                        29488 Woodward Ave. #427
                        Royal Oak, MI  48073
                        (313) 949-5414
                        tsmith@smithwebster1.com

Dated: March 1, 2022

                    **Verification**

I declare that the information above is true to the best of my knowledge, information and belief.

                    Leslie Cutright

**JURY DEMAND**

Plaintiff demands a jury trial.


Respectfully submitted,

SMITHWEBSTER LAW OFFICES, PLLC.

By: /s/ Tracy G. Smith
Tracy G. Smith
Attorney for Plaintiff
29488 Woodward Ave. #427
Royal Oak, MI  48073
(313) 949-5414
tsmith@smithwebster1.com

March 1, 2022